Query    Reports    Utilities    Help    What's New    Log Out

CLOSED

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CRIMINAL DOCKET FOR CASE #: 2:25-mj-01106-JFM All Defendants

Case title: USA v. Blakley                           Date Filed: 01/22/2025

Other court case number: 25-8-2 Eastern District of Pennsylvania    Date Terminated: 01/23/2025

Assigned to: Magistrate Judge James F Metcalf

**Defendant (1)**

**Fred Blakley**                    represented by    **Maritza Heras**
*TERMINATED: 01/23/2025*                             Federal Public Defenders Office - Yuma
                                                     2285 S 4th Ave., Ste. 2E
                                                     Yuma, AZ 85364
                                                     928-314-1780
                                                     Email: maritza_heras@fd.org
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: Public Defender or*
                                                     *Community Defender Appointment*

**Pending Counts**                           **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                        **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                               **Disposition**

18:1349-Mail and Wire Fraud Conspiracy;
18:1343-Wire Fraud; 18:1341-Mail Fraud;
18:371-Conspiracy

**Plaintiff**

**USA**                                                    represented by    **Louis C Uhl**
                                                                             US Attorneys Office - Yuma, AZ
                                                                             7102 E 30th St., Ste. 101
                                                                             Yuma, AZ 85365
                                                                             928-314-6410
                                                                             Email: Louis.Uhl@usdoj.gov
                                                                             *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*
                                                                             *Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/22/2025 | 1 | Arrest (Rule 5) of Fred Blakley. (SYV) (Entered: 01/22/2025) |
| 01/23/2025 | 2 | NOTICE *Government's Motion for Detention* by USA as to Fred Blakley. (Uhl, Louis) (Entered: 01/23/2025) |
| 01/23/2025 | 3 | MINUTE ENTRY for proceedings held before Magistrate Judge James F Metcalf: Initial Appearance in Rule 5(c)(3) Proceedings as to Fred Blakley held on 1/23/2025. Appearance entered by Maritza Heras on behalf of defendant. Defendant waives his right to an identity hearing and reserves all future proceedings be held in the prosecuting district. The court ORDERS defendant temporarily detained and ORDERS defendant to be transported to the Eastern District of Pennsylvania for all further proceedings. Commitment to another district shall issue.<br><br>**Appearances**: AUSA Louis Uhl (Duty) for the Government, AFPD Maritza Heras for defendant. Defendant is present and in custody. (Recorded by COURTSMART.) Hearing held 12:27 PM to 12:29 PM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SYV) (Entered: 01/23/2025) |
| 01/23/2025 | 4 | WAIVER of Rule 5(c)(3) Hearing by Fred Blakley. (SYV) (Entered: 01/23/2025) |
| 01/23/2025 | 5 | COMMITMENT TO ANOTHER DISTRICT as to Fred Blakley. Defendant committed to District of Eastern District of Pennsylvania.. Signed by Magistrate Judge James F Metcalf on 1/23/25. (SYV) (Entered: 01/23/2025) |
| 01/27/2025 | 7 | Notice to Eastern District of Pennsylvania of a Rule 5 or Rule 32 Initial Appearance as to Fred Blakley. Your case number is: 25-8-2. Please use PACER Court Links to access the public docket and documents.<br><br>*(If you wish to designate a different email address for future transfers, please send your request to the national list host at InterdistrictTransfer_TXND@txnd.uscourts.gov.)* (SYV) (Entered: 01/27/2025) |

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

United States of America
v.

FRED BLAKLEY a/k/a "Fred Blakely," a/k/a "Floyd Blakely"

*Defendant*

)
)
)
)
)
)
)

ARIZONA CASE NO: 25-01106MJ

Case No.    25-8-2

## ARREST WARRANT

To:    Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*    FRED BLAKLEY a/k/a "Fred Blakely," a/k/a "Floyd Blakely"                ,

who is accused of an offense or violation based on the following document filed with the court:

☒ Indictment          ☐ Superseding Indictment    ☐ Information    ☐ Superseding Information    ☐ Complaint
☐ Probation Violation Petition    ☐ Supervised Release Violation Petition    ☐ Violation Notice    ☐ Order of the Court

This offense is briefly described as follows:
18:1349 - MAIL AND WIRE FRAUD CONSPIRACY;
18:1343 - WIRE FRAUD;
18:1341 - MAIL FRAUD;
18:371 - CONSPIRACY

Date:    01/08/2025                    /S/ THOMAS GIAMBRONE, DEPUTY CLERK
                                *Issuing officer's signature*

City and state:    PHILADELPHIA, PA                /S/ GEORGE V. WYLESOL, CLERK OF COURT
                                *Printed name and title*

| Return |
|--------|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                    _____ |
|                                *Arresting officer's signature* |
|                                _____ |
|                                *Printed name and title* |

Filed Under Seal

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 24- |
| v. | : | DATE FILED: |
| MARY BLAKLEY | : | VIOLATIONS: |
| a/k/a "Marye Blakley" | | |
| a/k/a "Mary Blakely" | : | 18 U.S.C. § 1349 (mail and wire fraud |
| a/k/a "Mary Blakeley" | | conspiracy – 1 count) |
| a/k/a "Mary Davis" | : | 18 U.S.C § 1343 (wire fraud – 4 counts) |
| a/k/a "Mary Venable" | | 18 U.S.C § 1341 (mail fraud – 3 counts) |
| a/k/a "Mary Cammer" | : | 18 U.S.C § 371 (conspiracy – 1 count) |
| a/k/a "Rosemary Cammer" | | Notice of forfeiture |
| a/k/a "Rosemary Davis" | : | |
| a/k/a "Yvonne Davis" | | |
| a/k/a "Mary Blaksley" | : | |
| FRED BLAKLEY | : | |
| a/k/a "Fred Blakely" | | |
| a/k/a "Floyd Blakely" | : | |

## <u>INDICTMENT</u>

### <u>COUNT ONE</u>
### (Mail and Wire Fraud Conspiracy)

**THE GRAND JURY CHARGES THAT:**

At all times material to this indictment:

*The Defendants*

1.      Defendant MARY BLAKLEY, a/k/a "Marye Blakley," a/k/a "Mary Blakely," a/k/a "Mary Blakeley," a/k/a "Mary Davis," a/k/a "Mary Venable," a/k/a "Mary Cammer," a/k/a "Rosemary Cammer," a/k/a "Rosemary Davis," a/k/a "Yvonne Davis," a/k/a "Mary Blaksley," ("MARY BLAKLEY") was a resident of Lake Havasu City, Arizona, where she owned and operated what purported to be medical clinics through which she claimed to diagnose and treat a variety of diseases and medical conditions for persons throughout the United States (the "Blakley Clinics").

2.      Defendant MARY BLAKLEY held no medical licenses in Arizona, California, Nevada, or Utah, the states in which the Blakley Clinics operated.

3.      Defendant FRED BLAKLEY, a/k/a "Fred Blakely," a/k/a "Floyd Blakely" ("FRED BLAKLEY") was also resident of Lake Havasu City, Arizona. He claimed to be currently married to defendant MARY BLAKLEY despite the fact that they were divorced from each other in Texas in or about December 2001. Defendant FRED BLAKLEY was the business partner of defendant MARY BLAKLEY in, and assisted defendant MARY BLAKLEY with the operation of, the Blakley Clinics.

*The Federal Food and Drug Administration*

4.      The United States Food and Drug Administration ("FDA") was the federal agency responsible for protecting the health and safety of the public by enforcing the Federal Food, Drug, and Cosmetic Act (the "Act") and ensuring, among other things, that drugs intended for human use were safe and effective. The Act regulates medical devices, human and animal drugs, dietary supplements (regulated as food), and cosmetics. The Act has varying requirements for each of the product areas it regulates, with some areas (e.g., drugs and devices) requiring more regulatory oversight than others (e.g., cosmetics).

5.      The Act defines "drug" to include: (1) articles intended to diagnose, cure, mitigate, prevent, or treat disease in man or other animals; (2) articles intended to affect the structure or any function of the body of man or other animals; or (3) articles used as components of the above. 21 U.S.C. § 321(g)(1).

6.      Manufacturers of drugs, medical devices, and dietary supplements must register with the FDA and list their products so that the agency is aware they are manufacturing, packaging, processing, or holding a regulated product. Further, under the Act, drugs, medical

2

devices, and dietary supplements have labeling requirements.

       7.     Whether an article or product is regulated by the FDA at all, and whether it is regulated as a drug, device, dietary supplement, or cosmetic, depends on the intended use of the article or product. Determining a product's intended use is an objective inquiry into the article's likely use and involves a review of both oral and written representations made by those promoting the article to users or prospective users.

<em>The Blakley Clinics</em>

       8.     Through the Blakley Clinics, defendants MARY BLAKLEY and FRED BLAKLEY offered what purported to be medical treatment to the public at large. The central service performed by the Blakley Clinics was what defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates identified as the "full body scan." This scan consisted of an in-office procedure during which defendant MARY BLAKLEY, or an employee or associate who had received what purported to be training from defendant MARY BLAKLEY, operated what defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates claimed was an ultrasound machine enhanced by defendant MARY BLAKLEY's own proprietary "smart chip technology."

       9.     Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates, falsely and fraudulently claimed that the Blakley Clinics' full body scans, using defendant MARY BLAKLEY's purported "smart chip technology," could detect a variety of human diseases, illnesses, and conditions, including blood cancers, and candida in the bowel.

      10.     Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates, falsely and fraudulently claimed that the Blakley Clinics' full body

3

scans, using defendant MARY BLAKLEY's purported "smart chip technology," could also treat and cure a wide range of human diseases, illnesses, and conditions, including by: (i) "driving" a substance known as Aetheion into the body to kill cancer; (ii) "cleaning" the lungs and brainstem; and (iii) removing kidney stones.

11.     Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates, falsely and fraudulently claimed that the Blakley Clinics' full body scans, using defendant MARY BLAKLEY's purported "smart chip technology," could perform a multiplicity of other medical procedures including conducting colonoscopies, completing non-invasive prostate exams, measuring prostate-specific antigen ("PSA") levels, and performing electrocardiograms ("EKGs").

12.     Ultrasound is in fact a commonly used form of noninvasive medical imaging in which high-intensity sound waves are used to visualize structures inside of a patient's body. Healthcare providers use ultrasound exams to obtain images from inside a patient's body for several purposes, including to help to identify medical conditions and for image guidance while conducting certain medical procedures such as surgeries.

13.     While ultrasound equipment can be used to visualize (though not diagnose) at least certain tumors, it cannot be used to visualize or diagnose any type of blood cancer. Moreover, ultrasound equipment is not capable of treating cancer or any other type of disease, and no ultrasound machine has been approved by FDA to treat diseases in humans. No ultrasound machine is capable of performing non-invasive prostate exams, measuring PSA levels, or performing EKGs.

14.     Defendants MARY BLAKLEY and FRED BLAKLEY typically charged a client $300 for a full body scan. The Blakley Clinics did not accept medical insurance, so

persons seeking medical treatment from defendant MARY BLAKLEY and the Blakley Clinics
were required to pay the full charge out of their pockets.

15.    In order to promote the business of the Blakley Clinics, and to enrich
themselves, defendant MARY BLAKLEY and defendant FRED BLAKLEY sold to third
persons, located in the Eastern District of Pennsylvania and elsewhere, ultrasound machines that
defendant MARY BLAKLEY and defendant FRED BLAKLEY, and their employees and
associates, falsely and fraudulently claimed had been enhanced with defendant MARY
BLAKLEY's purported "smart chip technology" so that they could perform defendant MARY
BLAKLEY's full body scans.

16.    In order to promote the business of the Blakley Clinics, and to enrich
themselves, for a substantial fee defendant MARY BLAKLEY and defendant FRED
BLAKLEY, and their employees and associates, provided purported instruction, training, and
advice to the third-party purchasers and purported purchasers, located in the Eastern District of
Pennsylvania and elsewhere, of ultrasound machines from defendant MARY BLAKLEY and
defendant FRED BLAKLEY, to enable those third parties to charge members of the public for
the false, fraudulent, and detrimental services that they provided.

*Prescription of Unapproved Products to Treat Human Diseases*

17.    Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their
employees and associates, falsely and fraudulently prescribed to their human clients various
supplements, creams, and veterinary products as treatments for conditions purportedly
discovered during the full body scans conducted at the Blakley Clinics.

18.    The more conditions that defendant MARY BLAKLEY purported to
diagnose with her full body scan, the more supplements, creams, and veterinary products that

defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates could sell to clients of the Blakley Clinics.

19.    Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates, profited from their sale of supplements, creams, and veterinary products to clients of the Blakley Clinics.

20.    Among the supplements, creams, and veterinary products prescribed by defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates, were Aetheion cream ("Aetheion"), fenbendazole, and ProArgi9+. None of them were ever approved by the FDA to treat diseases in human beings.

21.    Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates, falsely claimed that Aetheion cream had various healing properties, including the ability to treat cancer, gastric hernias, and various other conditions. For example, defendants MARY BLAKLEY and FRED BLAKLEY repeatedly claimed that Aetheion would pull cancer cells out through the client's skin. They prescribed, promoted, and sold Aetheion to treat various conditions in their human clients despite the fact that Aetheion has never been approved by the FDA as a drug. In fact, Aetheion is labeled as a cosmetic that is advertised in the mainstream as a cosmetic product and skin therapy antioxidant moisturizer that strengthens skin against daily external aggressors.

22.    Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates also promoted fenbendazole to treat cancer in their human clients. For example, defendants MARY BLAKLEY and FRED BLAKLEY claimed that fenbendazole effectively treated cancer, including such cancers as breast cancer and blood cancer.

23.    Fenbendazole is an antiparasitic that is used as the active ingredient in an

6

animal drug, which is approved by the FDA for use in many different animal species, including dogs, cats, horses, cattle, and wildlife, to treat various parasites including lung worms, stomach worms, and intestinal worms. Fenbendazole is not approved for use in humans. Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates prescribed, promoted, and sold fenbendazole, under various names, to treat cancer in their human clients despite the fact that fenbendazole has only been approved by the FDA as a drug for use in animals.

24.     Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates also prescribed ProArgi9+ as medicine to human clients of the Blakley Clinics to treat various cardiovascular related diseases and prevent heart attacks. For example, defendant MARY BLAKLEY claimed that ProArgi9+ would remove plaques from the inside of clients' blood vessels, would thin the blood, and would dissolve blood clots. Defendant MARY BLAKLEY also claimed that ProArgi9+ would treat multiple sclerosis and diabetes and told one person that ProArgi9+ was "medicine" that would save that person's life.

25.     ProArgi9+ has never been approved by the FDA as a drug to treat diseases in humans. Instead, it has typically been sold only as a dietary supplement. This means that it is not to be sold or promoted to diagnose, treat, cure, or prevent any disease.

26.     In order to promote the business of the Blakley Clinics, and to enrich themselves, defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates, made false and fabricated claims about defendant MARY BLAKLEY's personal history, education, training, experience, qualifications, and credentials. Among other things, defendant MARY BLAKLEY falsely claimed that she was awarded a Ph.D. degree in radiation nuclear physics by the Karolinska Instituet in Sweden. To support that claimed credential,

defendant MARY BLAKLEY falsely asserted that she held dual U.S./Swedish citizenship. In truth and in fact, defendant MARY BLAKLEY was never awarded a degree from the Karolinska Instituet; was born and raised in the United States; and is a citizen of the United States and not Sweden.

27.    In order to promote the business of the Blakley Clinics, and to enrich themselves, defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates also falsely claimed that defendant MARY BLAKLEY worked as a cancer specialist and researcher at Cancer Center A, a particular renowned cancer center located in Houston, Texas and known to the grand jury. In truth and in fact, defendant MARY BLAKLEY was never employed by Cancer Center A.

28.    In order to promote the business of the Blakley Clinics, and to enrich themselves, defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates also falsely claimed that defendant MARY BLAKLEY was part of a research team that developed fenbendazole while employed by Pharmaceutical Company A, known to the grand jury, and that, from this experience, she knew that fenbendazole "cures cancer" but that Pharmaceutical Company A suppressed this information so that it would not lose money promoting their other cancer treatment drugs. In truth and in fact, defendant MARY BLAKLEY was never employed by Pharmaceutical Company A in any capacity.

## THE CONSPIRACY

29.    From at least in or about March 2021 through at least in or about November 2024, in the Eastern District of Pennsylvania, and elsewhere, defendants

**MARY BLAKLEY and
FRED BLAKLEY**

conspired and agreed together and with other persons known and unknown to the grand jury, to

commit mail fraud and wire fraud, that is, to knowingly execute and attempt to execute a scheme

to defraud clients of the Blakley Clinics, and to obtain money and property by means of false and

fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. §§ 1341 and 1343.

## MANNER AND MEANS

It was part of the conspiracy that defendant MARY BLAKLEY, defendant FRED

BLAKLEY, employees and associates of defendants MARY BLAKLEY and FRED BLAKLEY,

and others known and unknown to the grand jury:

30.     Made false and fraudulent claims about capabilities of ultrasound

machines generally, and of the particular machines employed by defendant MARY BLAKLEY

and the Blakley Clinics.

31.     Made false and fraudulent claims that the Blakley Clinics, and its

procedures and processes were FDA certified.

32.     Made false and fraudulent diagnoses to support the claimed need for

further scans and for the sale of various supplements, creams, and veterinary products to clients

of the Blakley Clinics.

33.     Conducted false and fraudulent full body scans and medical procedures

and made false and fraudulent diagnoses to prescribe substances that they falsely claimed had the

ability to cure the conditions purportedly discovered by the full body scans.

34.     Profited from the provision of full body scans to clients of the Blakley

Clinics.

35.     Profited from the sale of supplements, creams, and veterinary products to

clients of the Blakley Clinics delivered and caused to be delivered through the U.S. mails and

commercial carriers to the Eastern District of Pennsylvania and elsewhere.

9

36.     Profited from the provision of training to "students," located in the Eastern District of Pennsylvania and elsewhere, in the conduct of full body scans using ultrasound machines that purported to employ defendant MARY BLAKLEY's purported "smart chip technology."

37.     Profited from the sale of ultrasound machines that purported to employ defendant MARY BLAKLEY's purported "smart chip technology," thereby allowing those machine purchasers to conduct scans, and make purported diagnoses, for which they would charge members of the public.

38.     Cautioned clients of the Blakley Clinics that, if the supplements, creams, and veterinary products prescribed by defendant MARY BLAKLEY, defendant FRED BLAKLEY, and employees and associates of defendants MARY BLAKLEY and FRED BLAKLEY, were not used for the rest of the client's life, the illness or condition for which they had been prescribed would return.

39.     Used the Internet, including Yelp.com and Alignable.com, to promote the business of the Blakley Clinics by making false and fraudulent claims.

40.     In order to promote the business of the Blakley Clinics, and in order to convince clients to purchase treatments, prescriptions, and procedures, defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates made false and fabricated claims about defendant MARY BLAKLEY's education, training, experience, qualification, and credentials.

41.     To avoid detection by law enforcement officials and to avoid oversight by the FDA, defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates employed devices to shield their identities and activities, including frequent changes

10

in business name and location; frequent changes in the telephone numbers that they used to conduct Blakley Clinics business; favoring payment in non-traceable forms, such as cash or gold, and refusing insurance; and a persistent refusal to keep client medical records or financial records.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH FIVE
### (Wire Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.    Paragraphs 1 through 28 of Count One are incorporated here.

### THE SCHEME TO DEFRAUD

2.    From at least in or about March 2021 through at least in or about

November 2024, in the Eastern District of Pennsylvania and elsewhere, defendants

**MARY BLAKLEY and
FRED BLAKLEY**

devised and intended to devise a scheme to defraud clients and prospective clients of the Blakley

Clinics, and to obtain money and property by means of false and fraudulent pretenses,

representations, and promises.

### MANNER AND MEANS

It was part of the scheme that:

3.    Paragraphs 30 through 41 of Count One are incorporated here.

### THE WIRINGS

4.    On or about each of the dates set forth below, in the Eastern District of

Pennsylvania, and elsewhere, having devised and intending to devise this scheme, defendants

**MARY BLAKLEY and
FRED BLAKLEY**

for the purpose of executing the scheme described above, caused to be transmitted by means of

wire communication in interstate and foreign commerce the signals and sounds described below,

each transmission constituting a separate count:

12

| COUNT | APPROXIMATE DATE (AND TIME) | DESCRIPTION |
|---|---|---|
| 2 | May 21, 2021, at 20:45 UTC | Telephone call from Individual No. 1, known to the grand jury, from the Eastern District of Pennsylvania, to Associate No. 1, known to the grand jury, outside the Commonwealth of Pennsylvania, discussing the purported medical benefits of Aetheion. |
| 3 | November 15, 2022, at 3:56 p.m. | Email from defendant MARY BLAKLEY outside the Commonwealth of Pennsylvania to Individual No. 3, known to the grand jury, in the Eastern District of Pennsylvania, discussing the purported smart chip on the machine that Individual No. 3 had purchased. |
| 4 | November 21, 2022, at 20:41 UTC | Telephone call between defendant FRED BLAKLEY and defendant MARY BLAKLEY, outside the Commonwealth of Pennsylvania, and Individual No. 3, in the Eastern District of Pennsylvania, providing instruction on the conduct of full body scans. |
| 5 | August 2, 2023, at 15:47 UTC | Telephone call from Individual No. 2, known to the grand jury, in the Eastern District of Pennsylvania, to Associate No. 2, known to the grand jury, outside the Commonwealth of Pennsylvania, discussing the purported medical benefits of fenbendazole. |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS SIX THROUGH EIGHT
### (Mail Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 28 of Count One are incorporated here.

### THE SCHEME TO DEFRAUD

2.      From at least in or about March 2021 through at least in or about

November 2024, in the Eastern District of Pennsylvania, and elsewhere, defendants

### MARY BLAKLEY and
### FRED BLAKLEY

devised and intended to devise a scheme to defraud clients and prospective clients of the Blakley

Clinics, and to obtain money and property from them, by means of false and fraudulent

pretenses, representations and promises.

### MANNER AND MEANS

It was part of the scheme that:

3.      Paragraphs 30 through 41 of Count One are incorporated here.

### THE MAILINGS

4.      On or about each of the dates set forth below, in the Eastern District of

Pennsylvania, and elsewhere, having devised and intending to devise this scheme, defendants

### MARY BLAKLEY and
### FRED BLAKLEY

for the purpose of executing the scheme described above, knowingly caused to be delivered on or

about the date listed below, by the United States Postal Service or by private or commercial

interstate carrier, according to the directions thereon, the packages listed below, each mailing

constituting a separate count:

14

| COUNT | APPROXIMATE DATE | DESCRIPTION |
|---|---|---|
| 6 | August 31, 2022 | Bank check mailed from the Eastern District of Pennsylvania via U.S. Mail in partial payment for purchase of ultrasound machine. |
| 7 | January 13, 2023 | A package containing two bottles of Aetheion cream sent by Associate No. 1 to Individual No. 2 via U.S. Mail to the Eastern District of Pennsylvania. |
| 8 | June 12, 2023 | A package containing two bottles of fenbendazole sent by Associate No. 2 to Individual No. 2 via U.S. Mail to the Eastern District of Pennsylvania. |

All in violation of Title 18, United States Code, Section 1341.

## COUNT NINE
### (Conspiracy to defraud the FDA and to violate the Act)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.    Paragraphs 1 through 28 of Count One are incorporated here.

2.    One of the central animating purposes of the Act is to protect the health and safety of the American consuming public by assuring that drugs, among other things, are safe and effective for their intended uses before they are sold. One method that the Act employs to achieve this objective is by prohibiting introducing, delivering for introduction, and causing the introduction or delivery for introduction, into interstate commerce any drug that is misbranded. Title 21, United States Code, Sections 331(a) and 352.

3.    Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates, made oral and written representations to clients of the Blakley Clinics prescribing, promoting, recommending, and selling Aetheion, fenbendazole, and ProArgi9+: (i) to diagnose, cure, mitigate, prevent, or treat disease in human beings; and (ii) to affect the structure and any function of the body of human beings.

4.    Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates, introduced or delivered for introduction, and caused the introduction or delivery for introduction, into interstate commerce of Aetheion which was misbranded in that, among other things, its labeling was false or misleading and it failed to bear adequate directions for the uses for which the defendants prescribed, promoted, recommended, and sold Aetheion.

5.    Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates, introduced or delivered for introduction, and caused the introduction or delivery for introduction, into interstate commerce of fenbendazole which was misbranded in that, among other things, its labeling was false or misleading and it failed to bear adequate

16

directions for the uses for which the defendants prescribed, promoted, recommended, and sold fenbendazole.

6.      Defendant MARY BLAKLEY, defendant FRED BLAKLEY, and their employees and associates, introduced or delivered for introduction, and caused the introduction or delivery for introduction, into interstate commerce of ProArgi9+ which was misbranded in that, among other things, its labeling was false or misleading and it failed to bear adequate directions for the uses for which the defendants prescribed, promoted, recommended, and sold ProArgi9+.

### THE CONSPIRACY

7.      From in or about at least March 2021 through at least in or about November 2024, in the Eastern District of Pennsylvania, and elsewhere, defendants

**MARY BLAKLEY and
FRED BLAKLEY**

conspired, combined, and agreed with each other, and with others known and unknown to the grand jury, to:

a.      defraud the United States and its agencies by impeding, impairing, and defeating the lawful functions of the FDA to protect the health and safety of the public by ensuring that drugs marketed and distributed in the United States were safe and effective for their intended uses; and

b.      commit an offense against the United States, by, with the intent to defraud and mislead, introducing and delivering for introduction, and causing the introduction and delivery for introduction, into interstate commerce of drugs that were misbranded in violation of Title 21 United States Code, Sections 331(a) and 352(a) and (f).

17

## MANNER AND MEANS

It was part of the conspiracy that defendant MARY BLAKLEY, defendant FRED BLAKLEY, employees and associates of MARY BLAKLEY and FRED BLAKLEY, and others known and unknown to the grand jury:

8. Paragraphs 30 through 41 of Count One are incorporated here.

9. Falsely claimed that they were only doing research when they were performing, distributing, and selling products and services.

10. Falsely claimed that the products and services that they were performing, distributing, and selling were of a type for which regulatory requirements were less onerous or nonexistent.

11. Used coded language to describe the products and services that they were performing, distributing, and selling, such as describing their purported cancer treatment as the elimination of bad cells, and by coaching others to take such deceptive measures.

12. Disguised the nature of the Blakley Clinics, including as a religious organization, a health club, and a private membership organization, in an effort to avoid detection by law enforcement and oversight by the FDA.

13. Adopted business practices that they believed would shield them from detection by law enforcement and oversight by the FDA, such as requiring clients to execute confidentiality agreements.

## OVERT ACTS

In furtherance of the conspiracy, and to effect its objects, defendant MARY BLAKLEY, defendant FRED BLAKLEY, and other co-conspirators known and unknown to the

18

grand jury, committed the following overt acts, among others, in the Eastern District of Pennsylvania:

1.      On or about May 17, 2021, defendant MARY BLAKLEY spoke on the telephone to Individual No. 1, falsely claimed to have a Ph.D. in radiation nuclear physics from the Karolinska Medical Institute and recommended that Individual No. 1 acquire Aetheion cream from a person identified here as Associate No. 1 to use to treat breast cancer.

2.      On or about May 21, 2021, Associate No. 1 spoke on the telephone to Individual No. 1, who was located in the Eastern District of Pennsylvania, and recommended that Individual No. 1 acquire Aetheion cream and fenbendazole to use to treat breast cancer.

3.      On or about September 7, 2022, defendant MARY BLAKLEY and defendant FRED BLAKLEY caused a bank check in the amount of $500, which had been mailed from the Eastern District of Pennsylvania, to be deposited in an Arizona Financial Credit Union bank account in the name of Living Well Ministries in partial payment for an ultrasound machine that they claimed employed defendant MARY BLAKLEY's "smart chip technology."

4.      On or about November 21, 2022, defendant MARY BLAKLEY and defendant FRED BLAKLEY conducted a telephone conversation with Individual No. 2 and Individual No. 3, who were located in the Eastern District of Pennsylvania, in which they purported to teach Individual No. 3 to operate an ultrasound machine and use defendant MARY BLAKLEY's "smart chip technology" to detect cancer.

5.      On or about January 13, 2023, Associate No. 1 shipped two bottles of Aetheion cream and one bottle of fenbendazole to Individual No. 2, to the Eastern District of Pennsylvania, by U.S. Mail.

6.      On or about April 7, 2023, Associate No. 1 held a telephone call with Individual No. 2, who was located in the Eastern District of Pennsylvania, during which Individual No. 2 gave Associate No. 1 a credit card number to pay for fenbendazole.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     As a result of the violations of Title 18, United States Code, Sections 1341, 1343 and 1349, set forth in this indictment, defendants

**MARY BLAKLEY and
FRED BLAKLEY**

shall forfeit to the United States of America any property, real or personal, constituting, or derived from, proceeds traceable to such violations, including, but not limited to $2,000,000:

      2.     If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

        a.   cannot be located upon the exercise of due diligence;

        b.   has been transferred or sold to, or deposited with, a third-party;

        c.   has been placed beyond the jurisdiction of the Court;

        d.   has been substantially diminished in value; or

        e.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 28 United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

**A TRUE BILL:**


**GRAND JURY FOREPERSON**


**JACQUELINE C. ROMERO**
**UNITED STATES ATTORNEY**

22

GARY M. RESTAINO
United States Attorney
District of Arizona
LOUIE UHL
Arizona State Bar No. 021621
Assistant U.S. Attorney
7102 East 30th Street, Suite 101
Yuma, Arizona 85364
Telephone (928) 503-7954
Email: louis.uhl@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | 25-1105-MJ and |
|---|---|
| Plaintiff, | 25-1106-MJ |
| v. | **UNITED STATES' MOTION FOR DETENTION** |
| Mary Blakley | |
| Fred Blakley | |
| Defendant. | |

Because there are no combination of conditions that would guarantee the appearance of the defendants and the safety of the community, the United States respectfully seeks the detention of defendants (i) Mary Blakley a/k/a Mary Blakeley, a/k/a Mary Blakely, a/k/a Mary Blaksley, a/k/a Mary Davis, a/k/a Mary Venable, a/k/a Mary Cammer, a/k/a Rosemary Cammer, a/k/a Rosemary Davis, a/k/a Yvonne Davis; and (ii) Fred Blakley a/k/a Fred Blakely, a/k/a Floyd Blakely.

As explained below, based on their past conduct, the gravity of the pending fraud charges, and the potential for additional firearms related charges, both of the defendants pose significant risks of flight. Fred Blakely and Mary Blakely were previously

charged with federal drug crimes and fled while on pretrial release. They now face the prospect of decades in prison. Given the potential for lengthy sentences, their ages, the strength of the evidence, and the defendants' lack of ties to the Eastern District of Pennsylvania, there is every reason to believe that they would again flee to avoid prosecution.

Although the current charges are all fraud based, the defendants' conduct and statements, and the evidence disclosed from Court-approved searches of their residence and business premises, establish that they would, if released, pose a serious danger to the community. As detailed in the nine count indictment, the Blakleys owned and operated a series of unlicensed medical clinics at which they purported to diagnose and treat a series of human diseases, including cancers. Because their treatments were unapproved and ineffective, their many clients were deprived not only of the money that they paid for the bogus treatments, but also of the opportunity to obtain legitimate medical care. Because it would be impractical to monitor their conduct closely enough to prevent them from covertly resuming their business, the defendants' release, even on conditions, would pose a threat to the health of innocent consumers. Moreover, searches of areas controlled by the Blakleys uncovered an arsenal of weapons, which the defendants expressed every intention to use against law enforcement if they ever found themselves in this exact situation. These dangers to the community can be mitigated only by pretrial detention.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ARGUMENT**

**A.      Legal Standard**

As the Court is no doubt aware, the Bail Reform Act "requires a district court to order a defendant detained pending trial if 'no condition or combination of conditions will reasonably assure the appearance of the person as required.'" *United States v. Gentry*, 455 F. Supp. 2d 1018, 1019-20 (D. Ariz. 2006) (quoting 18 U.S.C. § 3142(e)). This analysis involves a "two-step inquiry." *Id.* First, the Court must make a finding as to whether the defendant presents a "serious risk that such person will flee" if not detained. *Id.* at 1020 (quoting 18 U.S.C. § 3142(f)(2)(A)). The government bears the burden of proving such risk of flight by a preponderance of the evidence. *Id.* Second, if the defendant is likely to flee, the Court next must determine whether some set of conditions would sufficiently vitiate that risk. *Id.* (citing 18 U.S.C. § 3142(g)). "In making the determination whether conditions exist that would reasonably assure a defendant's appearance, Section 3142(g) requires the district court to take into account four statutory factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or community that would be posed by the person's release." *Id.*

In addition to seeking detention based on the risk of flight, the United States also may seek detention on the ground that the defendant poses a risk of danger to the community. The government bears the burden of proving such danger by clear and convincing evidence. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) ("A finding that a defendant is a danger to any other person or the community must be supported by 'clear and convincing evidence.'") (quoting 18 U.S.C. § 3142(f)(2)(B)).

**B.   Flight Risk**

The Court should find, for several reasons, that releasing Mary Blakely or Fred Blakely under any set of conditions would create a significant risk of flight and endanger the public.

Nature And Circumstances Of Charged Offense. Mary Blakely and Fred Blakely are charged with nine felony counts, comprising: (i) a mail and wire fraud conspiracy; (ii) four substantive wire fraud counts; (iii) three substantive mail fraud counts; and (iv) a separate conspiracy to defraud the Food and Drug Administration ("FDA") and to violate the Food, Drug, and Cosmetic Act. As detailed in the indictment, the defendants operated a series of clinics throughout the United States through which they claimed to diagnose and treat a variety of human illnesses and ailments. Both sets of claims were medically and factually false. Many of the diseases that the defendants purported to diagnose were not detectible using the equipment that the defendants employed. Likewise, none of the treatments offered by the defendants were at all effective in treating or curing the purported conditions diagnosed.

As detailed in the indictment as returned by the grand jury, the defendants extracted millions of dollars from their clients by means of their false claims. Worse yet, many clients were falsely told that they were suffering from serious diseases that could only be remedied through continuing the treatments and medications sold to them by the defendants. It did not, however, end with false fears. Some of the defendants' clients suffered from conditions such as cancers that were amenable to conventional medical treatment. By offering their ineffective pseudo-therapies in lieu of conventional treatment, and by discouraging their clients from seeking out this conventional treatment, the defendants deprived their trusting clients of the opportunity for continued life and health.

The defendants face a maximum possible sentence on the current charges of 165 years of imprisonment. Given an economic loss of $2 million, the government conservatively estimates sentencing guideline ranges for both defendants of at least 87-108 months. Here, given that the defendants' victims suffered very substantial non-economic losses, an upward departure or variance is predictable.

Mary Blakley is 75 years old while Fred Blakley is 60. If convicted of these charges, they face the very real possibility of spending the rest of their lives in federal prison. Such exposure creates a powerful incentive to flee. *See, e.g., United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); *United States v. Anderson*, 384 F. Supp. 2d 32, 35 (D.D.C. 2005) (ordering pretrial detention in white collar case, even though the defendant had no prior

felony convictions and "no history of violent criminal activity," in part because "[t]he combined statutory maximum penalties for the federal crimes with which Mr. Anderson is charged is 23 years. . . . At 51 years old, Mr. Anderson potentially could spend most of the remainder of his life in prison if convicted.").

<u>Strength Of The Evidence</u>.  The strength of the evidence also supports a flight-risk finding. As an initial matter, the fact the grand jury has returned an indictment is enough to meet the government's initial burden as to the strength-of-the-evidence factor. *See, e.g., United States v. Bradshaw*, 2000 WL 1371517, *4 (D. Kan. 2000) ("[T]he grand jury's indictment, standing alone, establishes probable cause for purposes of the Bail Reform Act.").

In addition, the indictment in this case is a speaking indictment that sets forth, in detail, some of the evidence supporting the charges against the Blakleys. The indictment recites the defendants' false claims about the "smart chip technology" that Mary Blakley supposedly invented and about the animal dewormer and other substances that they prescribed to their patients and from which they profited.

Most compellingly, the case against the defendants is founded on extensive undercover operations conducted by the Federal Bureau of Investigation ("FBI") between early 2021 and late 2023. These undercover operations included an FBI Task Force Officer, designated as "UCE-1," and FBI Special Agents, designated as "UCE-2" and "CHS"[1]

---

[1] UCE stands for "Undercover Employee." CHS stands for "Confidential Human Source." The CHS was an FBI Special Agent when the investigation began and was originally designated as

- 6 -

(collectively, the "Undercovers"). The Undercovers posed as customers, a cancer patient, a relative of a cancer patient, and a potential business associate of the Blakleys. As a result of these operations, the government has collected a mass of evidence against the defendants, including dozens of hours of recorded in-person and telephone conversations along with emails, text messages, documents, and equipment. On top of this, searches conducted at the time of the defendants' arrests, and voluntary admissions made by the defendants to federal agents, have further solidified the already overwhelming case against them.

Defendants' History And Characteristics. The Blakleys' history and characteristics establish both a severe risk of flight and an otherwise unmanageable danger to the community.

Fred Blakley has a criminal history dating back to 1992. Most pertinently, Fred Blakley was arrested in May of 1997 and later charged in the District of Nevada with conspiracy to possess with intent to manufacture and manufacturing methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(d)(1).[2] While on bail awaiting trial in federal court, Fred Blakeley violated the terms of his pretrial release by absconding from supervision. He was later located and arrested in the

UCE-3. During the course of the investigation, the CHS retired from the FBI and took on the designation "CHS," which is typically used for a non-FBI employee confidential source.

[2] At the time Fred Blakley was charged, 21 U.S.C. § 841(d)(1) prohibited possessing a listed chemical with the intent to manufacture a controlled substance. This subsection of the statute currently prohibits boobytrapping federal property.

District of Minnesota, was returned to the District of Nevada, pleaded guilty, and was sentenced to 60 months incarceration followed by five years of supervised release. He was released from incarceration on March 26, 2001.

Mary Blakley has a criminal history dating back to 1971. She was arrested in the same case as Fred Blakley in May 1997, and faced similar charges for manufacturing methamphetamine. Like her husband, Mary violated the terms of her pretrial release by absconding from supervision. She too was eventually located and arrested in the District of Minnesota, was returned to the District of Nevada, and pleaded guilty. Mary Blakley was sentenced to 57 months incarceration and four years supervised release. She was released from incarceration on January 4, 2002.

Although the Blakleys' prior federal charges were lodged more than 20 years ago, the fact that they both promptly fled rather than honor their commitment to appear in court as required suggests that the are likely to pursue the same course now. Indeed, given their ages, and given the prospect of very substantial sentences for the current charges, their incentive to flee is even greater now.

The prospect of the Blakleys' absconding is amplified by the evidence discovered by agents conducting searches coincident with the defendants' arrests. The undercover operations established that Fred Blakley maintained a workshop in a garage on his pastor's property in which he collected, built, and modified firearms. A search of this facility resulted in the recovery of about 30 firearms and 30,000 rounds of ammunition. As a felon, Fred Blakley was not permitted to possess even one gun or bullet, much less the arsenal that he controlled. In a post-arrest statement, Fred Blakley

admitted that he knew that it was unlawful for him to possess firearms and that he had done so anyway.

Fred Blakleys' post-*Miranda* admissions were confirmed by many of his statements and boasts recorded during the undercover operations. During a May 20, 2023 meeting, Fred Blakley invited two of the Undercovers into his firearm workshop. Once inside, he showed them multiple firearms, scopes, a suppressor, and boxes of ammunition. During that same meeting, Fred Blakley discussed with them a fully-automatic firearm that he owned:

> UCE-2: Can that shoot really fast too?
>
> FRED: Not as fast as you can pull the trigger.
>
> UCE-2: So you gotta keep pulling it. It's not like –
>
> FRED: Yeah – there's no – we only have one fully auto gun. We don't really want them fully auto.
>
> UCE-2: Really?
>
> FRED: Burn up too much ammunition [OV] you can – you can empty a magazine in five seconds. Less than five seconds.
>
> UCE-2: Is that got a bigger bul – how that – do you still have that one with that shoots really fast that we saw that one time or –
>
> FRED: Yeah I have – that's the only one we have that is fully auto.
>
> UCE-2: Is that over here too?
>
> FRED: Oh yeah, everything I own is over here.
>
> CHS: Oh. At least it's not rusting out like those others.
>
> UCE-2: [OVE] that's the one right there?
>
> FRED: That's just my fully auto weapon here.

The firearms were not confined to Fred Blakley's workshop. In an earlier meeting, on August 12, 2022, Fred Blakley invited undercovers into the home that he shared with Mary Blakley in Lake Havasu City. Inside the residence, Fred Blakley displayed his firearms collection to UCE-2 and the CHS, and posed for photographs with the weapons, including a scoped rifle, an AR-15 that Fred Blakley claimed was fully automatic, and a semi-automatic shotgun.

In a recorded undercover meeting on December 1, 2022, Fred and Mary Blakley explained why they moved Fred Blakley's firearms out of their house. The Blakleys told the undercovers that Mary Blakley's son, who was then on parole from a rape conviction, was moving into their home. They were worried about keeping any weapons at the house because the son's parole officer could search the house at any time as part of the conditions of the son's parole. As a consequence, they would have to stash Fred Blakley's weapons and milling equipment at a different location. Several months later, in a March 14, 2023, meeting, Fred Blakley and Mary Blakley told the undercovers that the firearms had been moved to a garage located on their pastor's property. Notwithstanding the defendants' efforts to sanitize their residence, a warranted search of the Blakleys' home at the time of their arrest uncovered 47 rounds of ammunition.

The discovered cache of firearms and ammunition represents an additional legal peril not only for Fred Blakley but also for Mary Blakley. Both of them are felons who are prohibited from possessing firearms or ammunition. They both possessed the ammunition discovered in their home as well as the firearms that Fred Blakley displayed to the undercovers in that same home on August 12, 2022. Mary Blakley, moreover, not only

- 10 -

knew why and to where the weapons from their home had been moved, but understood that Fred Blakley was actually manufacturing firearms at that facility and was distributing them to others. Indeed, in a May 17, 2023 meeting, and despite her belief that UCE-2 was a prohibited person, Mary Blakley actually encouraged UCE-2 to acquire a gun from Fred Blakley:

> MARY: Yeah, him and Pastor have been making guns

> UCE-2: Is that right?

> MARY: Thousands of guns.  We're arming – arming Arizona.

> UCE-2: They got an extra one?

> MARY: I think that he does.  I think he did.  You got to call him.

> UCE-2: You think – really?

> MARY: Did you call, did you call and ask him if he had a gun ready for you?

> UCE-2: No I didn't get a chance to.  I didn't talk to him (UI).

> \* \* \*

> UCE-2: He says he got a nice little gun, uh, workshop.

> MARY: Oh yeah, they got a big garage.  Him and pastor are making guns for the world.

> UCE-2: Wow, with all the toys and stuff like that?

> MARY: Yeah.  Yeah, they're arming America

Both Fred Blakley and Mary Blakley face the prospect of additional firearms-related charges being lodged against them in the District of Arizona. On top of the serious

charges that have already been filed, this possibility provides an added reason for them to once again flee to avoid facing trial, conviction, and imprisonment.

Danger To Community If Released.    As discussed above, the defendants' charged fraud presents the prospect of not only financial, but also emotional and physical harm to any of their victims unlucky enough to believe in the defendants' claims of medical expertise.  In addition, their established penchant for acquiring, manufacturing, and dispensing firearms presents an additional clear and compelling danger.

That, however, is not the end of it. In recorded conversations, Fred Blakley confided his desire and intention to use his illegal firearms to kill other human beings, especially those with whom he disagreed politically or anyone who came to arrest him. For example:

1.  From a recording of meeting dated: July 8, 2023:

FRED: 62 grain. These are the green tips.

UCE:  Yeah.

FRED: These are light armor piercings.

UCE:  These are the ones I need to get.

FRED: No, you don't really need those.

JD:    No. That'll skin 'em, kill 'em, and cook 'em.

FRED: It'll go through it so fast they may not have realized they're dead yet. (laughter) Because those are light armor piercings. They go through flesh like (UI). Like a beam of light.

…………

2.  From a recording of meeting dated: May 20, 2023:

      FRED: I don't hunt animals.

      CHS: You don't hunt deer?

         (Laughing)

      FRED: People are the only thing that guns ever gonna shoot.

3.  From a recording of meeting dated: October 20, 2022:

      FRED: Oh so they must be part of the Democratic party too.

      [all four participants laugh]

      UCE: You got a rifle for that?

      FRED: Yeah, I got a ri-I have a-every-every bullet I have has a 'D" on it [OV]

      UCE: That fly riffle, I would shoot the flies, yeah

      [all four participants laugh]

      UCE: Now I gotta get mine to

      FRED: You talking about a worthless bunch of oh-oh

      UCE: Yeah, I have the same

      FRED: And I-I-I woke up one night and it kinda, just woke up startled cause uh the dream I was having was I had my fully automatic weapon and I was unloading on their asses

      [UCE laughs]

FRED: And I think-and it was like when I woke up, shit it's over, damn that's too soon

UCE: Put me back to sleep

FRED:      [laughs] yeah, I was, wish I was going back to that dream

UCE: Give me a shot, put me back out

FRED: Yeah, that never works out but that woulda been nice if I coulda, I wasn't done yet.

UCE: Then ya-then ya go back in the dream

FRED: See those are the kind of visions, those are the kind of visions that I actually have. I mean, I'm not kidding you, my anger is so immense towards these people, I mean I'd just kill 'em without even re-without any thought of remorse [OV]

4. From a recording of meeting dated: August 11, 2022:

FRED: We're gonna have to go to war with our own government...a civil war which it very well could. We know that from the higher ups. Well, they're trying to start a civil war. That's their game plan right now.... You better arm up good. I've got thousands of rounds of ammunition, and I'm ready to rock.

* * *

FRED: As a matter of fact, I'm planning on shooting some humans, so I got pointed top points for them. If I have to shoot humans, which I'm probably going to eventually when they, when this crap starts, I bought a bunch of pointed top points. Deer rounds. For humans. With a human, just like a deer. If you hit a bone, it can bust through them. Hits the surface, it busts them, tears a big chunk out of them. They don't get up after that.

* * *

FRED: So that was also a private purchase, so there was no paperwork.

UCE: But the guy—

- 14 -

FRED: If I had bought a gun from a gun shop, you have to have an FFL first.

UCE: Okay. Do you have an FFL?

FRED: No I do not.

UCE: So how—

FRED: Because if you have an FFL, you're on a gun owner list. T

UCE: You don't want to be on that.

FRED: No, I don't want to be on that. I don't want them coming to my house the day when they start.

UCE: Yeah.

FRED: Then I'll have to get in a gun battle and probably die.

UCE: Yeah, you don't want to deal with that.

FRED: Because if (UI) they're gonna take mine, that's exactly what's gonna happen. There's gonna be a gun battle. If I die, then so be it.

<u>Futility of Conditions of Release</u>:

These threats to the public cannot be ameliorated by conditions. Fred Blakley demonstrated an unusual measure or resourcefulness in acquiring weapons despite his prohibited status. In recorded conversations he detailed extensive successful efforts to straw purchase firearms through others, to acquire them through undocumented personal exchanges, and to build them himself. More ominously, the fully automatic weapon which Fred Blakley bragged about repeatedly and displayed to undercovers was not found by the searching agents. Given its confirmed existence, and the Blakleys' demonstrated penchant

for hiding their firearms, an order of release would place the Blakleys in a position to recover this instrument of carnage. Moreover, Fred Blakley's emails disclosed hundreds of pieces of correspondence with firearms dealers and sellers, as well as actual deliveries by mail or carrier. It is therefore certain that, unless Fred Blakely is detained, he will find a way to acquire firearms and, having done so, will pose an imminent danger to law enforcement officers and members of the public.

Conclusion. In sum, Mary Blakley and Fred Blakley pose a serious risk of flight due to the severity the charges and penalties they face; the fact that their legal situation threatens to get even more perilous than it already is; and the fact that both defendants have demonstrated a willingness to flee to avoid prosecution. On top of this palpable risk of flight, the defendants' own words and actions establish that they will represent a clear and concrete danger to law enforcement and the community at large unless they are detained pending trial.

Respectfully submitted this 24th day of January, 2025.


GARY M. RESTANIO
United States Attorney
District of Arizona


 s/  Louie Uhl
LOUIE UHL
Assistant U.S. Attorney

- 16 -

PAUL G. SHAPIRO, paul.shapiro@usdoj.gov)
RUTH MANDELBAUM, ruth.mandelbaum@usdoj.gov
Assistant United States Attorneys
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Telephone (215) 764-2241

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of January 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

*Attorney for Defendant Mary Blakley*

*Attorney for Defendant Fred Blakley*

*s/ Louie Uhl*
U.S. Attorney's Office

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

RECEIVED / LODGED
COPY

JAN 2 3 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

| | |
|---|---|
| **United States of America** | **Case Number: 25-01106MJ-001** |
| v. | |
| **Fred Blakley** | **Charging District's Case No. 25-8-2** |

## WAIVER OF RULE 5 & 5.1 HEARINGS
### (Complaint or Indictment)

I understand that I have been charged in another district, the United States District Court, Eastern District of Pennsylvania.

I have been informed of the charges and of my rights to:

(1) retain counsel or request the assignment of counsel if I am unable to retain counsel;

(2) an identity hearing to determine whether I am the person named in the charges;

(3) production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;

(4) a preliminary hearing to determine whether there is probable cause to believe that an offense has been committed, to be held within 14 days of my first appearance if I am in custody and 21 days otherwise, unless I have been indicted beforehand.

(5) a hearing on any motion by the government for detention;

(6) request a transfer of the proceedings to this district under Fed. R. Crim. P. 20, to plead guilty.

I agree to waive my right(s) to:

☐ an identity hearing and production of the warrant.

☐ a preliminary hearing.

☐ a detention hearing.

☒ an identity hearing, production of the judgment, warrant, and warrant application, and any preliminary or detention hearing to which I may be entitled in this district. I request that my preliminary hearing and/or detention hearing be held in the prosecuting district, at a time set by that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are pending against me.

Date: January 23, 2025

_____ for
*Defendant's Signature*
Fred Blakley

_____
*Signature of defendant's attorney (if any)*

Maritza Heras
*Printed name of defendant's attorney (if any)*

AO 466A (Rev. 12/17)  Waiver of Rule 5 & 5.1 Hearings (Complaint or Indictment)

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

REC'D BY USMS YUMA, AZ
JAN 23 2025 PM3:17

| | |
|---|---|
| **United States of America** | **Case Number: 25-01106MJ-001** |
| **v.** | **Charging District's Case No.** |
| **Fred Blakley** | 25-8-2 |

## COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the Eastern District of Pennsylvania. The defendant may need an interpreter for this language: _____.

The defendant:    ☐  will retain an attorney.

☒  is requesting court-appointed counsel.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant. The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled. The clerk of this district must promptly transmit the papers and any bail to the charging district.

Dated this 23rd day of January, 2025.

Honorable James F. Metcalf
United States Magistrate Judge