IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA   : | |
| v.   : | CRIMINAL NOS. 25-8-2 & 25-537-1 |
| FRED BLAKLEY   : | |

**GOVERNMENT'S CHANGE OF PLEA MEMORANDUM**

I.   **BACKGROUND**

Defendant Fred Blakley is charged in a superseding indictment in case 25-8-2 (the "superseding indictment"), with conspiracy to commit wire fraud and mail fraud, in violation of 18 U.S.C. § 1349 (Count One), substantive mail and wire fraud offenses, in violation of 18 U.S.C. §§ 1343 and 1341 (Counts Two through Eight), and conspiracy to defraud the United States and commit an offense against the United States, in violation of 18 U.S.C. § 371 (Count Nine). Fred Blakley has notified the government through his counsel that he wishes to plead guilty to Counts One and Nine of the superseding indictment.

Defendant Fred Blakley is additionally charged in an information in case 25-537-1 (the "information"), with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) (Count One). Fred Blakley has notified the government through his counsel that he wishes to waive indictment, waive venue, and plead guilty to Count One of the information.

The pleas to both the superseding indictment and the information are contained in one consolidated plea agreement and the government discusses them both in this memorandum.

II. **APPLICABLE STATUTE AND ESSENTIAL ELEMENTS OF THE OFFENSE**

**Count One of the superseding indictment.** To prove conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 1349, the government must prove the following elements beyond a reasonable doubt:

First: Two or more persons agreed to commit mail or wire fraud;[1]

Second: The defendant was a party to or a member of that agreement; and

Third: The defendant joined the agreement or conspiracy knowing of its objectives to commit mail fraud or wire fraud and intending to join together with at least one other alleged coconspirator to achieve that objective.

*See* Third Circuit Model Jury Instruction (Criminal) 6.18.371A.

**Count Nine of the superseding indictment.**[2] To obtain a conviction for conspiracy defraud the United States, in violation of 18 U.S.C. § 371, the government must prove the following elements beyond a reasonable doubt:

---

[1] To prove a substantive violation of the wire fraud statute, 18 U.S.C. § 1343, the government must prove the following: (1) the defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations, or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature); (2) the defendant acted with the intent to defraud; and (3) in advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce. *See* Third Circuit Model Criminal Jury Instruction (Criminal) 6.18.1343.

To prove a substantive violation of the wire fraud statute, 18 U.S.C. § 1341, the government must prove the following: (1) the defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations, or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature); (2) the defendant acted with the intent to defraud; and (3) in advancing, furthering, or carrying out the scheme, the defendant used the mails, or caused the mails to be used. *See* Third Circuit Model Criminal Jury Instruction (Criminal) 6.18.1341.

[2] The government charges a two-pronged conspiracy in Count 9: conspiracy to (1) defraud the United States and (2) commit an offense against the United States by violating the Food, Drug,

    First:        Two or more persons agreed to "defraud the United States" as charged in the indictment. "Defraud the United States" means to cheat the United States government or any of its agencies out of money or property. It also means to obstruct or interfere with one of the United States government's lawful functions by deceit, craft, trickery, or dishonest means;

    Second:    The defendant was a party to or a member of that agreement;

    Third:     The defendant joined the agreement or conspiracy knowing of its objective to defraud the United States and intending to join together with at least one other conspirator to achieve that objective; and

    Fourth:    At some time during the existence of the agreement or conspiracy at least one of its members performed an overt act in order to further the objective of that agreement.

*See* Third Circuit Model Jury Instruction (Criminal) 6.18.371B.

To obtain a conviction for conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, the government must prove the following elements beyond a reasonable doubt with respect to each defendant:

    First:        Two or more persons agreed to commit an offense against the United States, here, to violate the Food, Drug, and Cosmetic Act ("FDCA");[3]

    Second:    The defendant was a party to or member of that agreement;

---

and Cosmetic Act. These are two alternative ways to commit a single conspiracy offense. *See United States v. Rigas*, 605 F.3d 194, 203-12 (3d Cir. 2010).

[3] To prove the substantive offense of violating the FDCA by introducing misbranded articles into interstate commerce, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), the government must prove: (1) the substance was a drug; (2) the defendant distributed the drug or caused the drug to be distributed in interstate commerce; (3) the drug was misbranded; and (4) the defendant acted with an intent to defraud or mislead (for a felony). *See* 21 U.S.C. §§ 331(a) and 333(a)(2).

    Third:      The defendant joined the agreement or conspiracy knowing of its objective to commit an offense against the United States and intending to join together with at least one other alleged conspirator to achieve that objective; and

    Fourth:     At some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

*See* Third Circuit Model Jury Instructions (Criminal) 6.18.371A.

**Count One of the information.** To obtain a conviction for possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), the government must prove the following elements beyond a reasonable doubt:

    First:       The defendant has been convicted of a felony, that is, a crime punishable by imprisonment for a term exceeding one year;

    Second:    That after this conviction, the defendant knowingly possessed the firearm described in Count One of the information;

    Third:      At the time that the defendant possessed the firearm, the defendant knew of the previous conviction and knew that it was for a crime punishable by imprisonment for a term exceeding one year; and

    Fourth:     The defendant's possession of that firearm was in or affecting interstate or foreign commerce.

*See* Third Circuit Model Criminal Jury Instruction § 6.18.922G.

### III.   <u>MAXIMUM PENALTIES</u>

The maximum penalties are as follows:

For Count One of the superseding indictment, charging conspiracy to commit mail and wire fraud, a term of imprisonment of 20 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100.

For Count Nine of the superseding indictment, charging conspiracy to defraud the United States and violate the FDCA, a term of imprisonment of 5 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100.

For Count One of the information, charging felon in possession of a firearm, a term of imprisonment of 15 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100.

The total permissible statutory maximum sentence is a term of imprisonment of 40 years, a term of supervised release of 3 years, a fine of $750,000, and a special assessment of $300. Full restitution on Counts One and Nine of the superseding indictment also shall be ordered. Forfeiture of any property, real or personal, constituting or derived from, proceeds traceable to the violations of Counts One and Nine of the superseding indictment and forfeiture of all firearms or ammunition involved in the violation of Count One of the information also may be ordered. The defendant further understands that supervised release may be revoked if its terms and conditions are violated. When supervised release is revoked, the original term of imprisonment may be increased by up to 2 years on each of Counts One and Nine of the superseding indictment and Count One of the information. Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant

will have to serve the original sentence, plus a substantial additional period, without credit for time already spent on supervised release.

## IV. FACTUAL BASIS FOR THE PLEA

1. Fraud Case, 25-cr-8-2

If the case alleged in the superseding indictment were to proceed to trial, the government would prove the following facts, among others, through witness testimony and exhibits. This memorandum sets forth only the essential facts that would need to be proved to establish the elements of the offenses charged.[4]

From approximately 2006 through approximately January 22, 2025, the defendant Fred Blakley, and co-defendant Mary Blakley (collectively, "the defendants"), operated purported medical clinics in multiple states, including Arizona, California, and Colorado, where they offered purported medical treatment to the public at large (the "Blakley Clinics").

At the center of the scheme was the "full body scan" conducted by Mary Blakley for approximately $300, typically paid in cash or check only. The scans were conducted using conventional ultrasound machines. The defendants and their co-conspirators claimed that these full body scans could detect, treat, and cure various illnesses, including cancer. The defendants claimed that the machines had special capabilities because they contained proprietary "smart chip" technology. Mary Blakley described this technology, frequently in Fred Blakley's presence, as either hardware or software that could be programmed into the ultrasound machines, "pushed" remotely into the machines, or otherwise installed in the machines. Mary Blakley

---

[4] The superseding indictment alleges, and the government intends to prove at sentencing, that Mary Blakley performed non-effective and technologically impossible procedures as part of the full body scans at the Blakley Clinics. This fact is not necessary to satisfy the elements of the charged offenses and, thus, is not included in the factual basis.

- 6 -

claimed that she had invented the software or that it had been invented by the United States military. Repeatedly and consistently, Mary Blakley claimed that the software was secret, should not be talked about around others, and could be erased with the click of a button. At trial the government would establish that there was no special hardware or software installed in the ultrasound machines used in the Blakley Clinics and also that both Mary Blakley and Fred Blakley were aware that the machines did not have any special capabilities.

As shown in undercover recordings and corroborated by clients and associates, the full body scan followed a typical pattern. Mary Blakley would scan various areas of the client, measuring organs, opining on the health of the various organs, and periodically "activating the chip" or "lighting it up like a Christmas tree" to purportedly determine whether cancer cells were present. When she claimed to detect cells, she would activate an alleged "laser" on the machine to "drive" a cosmetic cream, called Aetheion, into the client to purportedly kill the cells. During the scan, Mary Blakley also claimed to conduct a non-invasive colonoscopy; if necessary, what she termed a "biopsy"; a prostate exam and evaluation of prostate specific antigen levels in male clients; and, sometimes, an electrocardiogram ("EKG"). She also claimed to scan the client's brain stem to detect scarring, measure bone density, evaluate blood flow, detect arterial age, and measure immune system levels. If necessary, she claimed to "blast" kidney stones using the machine's "laser." Towards the end of the scan, Mary Blakley would allegedly clean out what she claimed to be toxins, shedding, or scarring on the lungs using what she claimed to be a more powerful machine. By the end of 2023, Mary Blakley claimed to complete the lung cleaning using a unique prototype "sweeper" machine.

During the scanning process, an additional co-conspirator was often present to record the results of the scan. This person, known as the "charter," was directed by Mary Blakley to write

down various measurements and circle, on the back of the sheet, various products recommended to treat purportedly diagnosed conditions. At the end of the scan, the defendants encouraged the client to return regularly for evaluations.

The defendants furthered their scheme by directing clients of the Blakley Clinics to purchase various substances and supplements to treat, cure, and prevent the diseases allegedly diagnosed during the scans. In particular, the defendants and their co-conspirators touted: (1) Aetheion (referenced above), which comes in the form of a lotion to be rubbed over the body and is advertised in the mainstream as a cosmetic product and skin therapy antioxidant moisturizer that strengthens skin against daily external aggressors; (2) fenbendazole, in various forms (including Panacur and Fenben Bio), an antiparasitic that is the active ingredient in an animal drug and approved by the Food and Drug Administration (the "FDA") for use in many different animal species, but not for use in humans; and (3) ProArgi9, an l-arginine supplement, manufactured and distributed through Synergy Worldwide, a multi-level marketing company. Both defendants, and their co-conspirators, promoted Aetheion and fenbendazole to treat, cure, and prevent cancer and other diseases. The defendants and co-conspirators promoted ProArgi9 to treat various cardiovascular diseases and prevent heart attacks and strokes.

The defendants caused these substances to be transported in interstate commerce. Because the defendants encouraged clients to take these substances to prevent, cure, or mitigate diseases, these substances are considered drugs for the purposes of the FDCA. These drugs did not bear labels containing adequate directions for use in treating and preventing these various conditions and were, therefore, misbranded under the FDCA.

The defendants also profited by franchising their clinics. The defendants trained others to conduct the scanning procedure, charging approximately $20,000 for the training program. The

defendants ensured that the trainees would not operate in the same states where the defendants operated clinics to avoid any competition.

To promote their clinics, and gain the trust of potential clients, the defendants made various false and misleading claims touting Mary Blakley's background and credentials. Mary Blakley claimed that she held dual U.S.-Swedish citizenship and was able to learn the techniques and methods she employed by practicing European medicine in Sweden. In fact, she was born in Texas and has never left the United States.

In the clinic office, the defendants displayed various diplomas purporting to show that Mary Blakley had obtained a Ph.D. in nuclear physics from the Karolinska Institutet in Sweden and Ph.D. degrees in "Training and Development" from Gatesville University and Almeda University. Mary Blakley frequently bragged about her time and studies at the Karolinska Institutet. However, Mary Blakley never attended the Karolinska Institutet. Moreover, Gatesville University and Almeda University are sham universities, often referred to as diploma mills.

Mary Blakley also claimed that she had spent approximately thirty years working at MD Anderson Cancer Center in Houston, Texas and had worked to develop fenbendazole while employed at Merck & Co., a pharmaceutical company. Mary Blakley was never employed at either institution.

Both Mary Blakley and Fred Blakley knew that these claims about Mary Blakley's background were false.

To promote their clinics, and gain the trust of their potential clients, the defendants falsely claimed that their clinics, the procedures they conducted, and the machines they used were "FDA certified."

The defendants took various active measures to shield their clinics from government scrutiny, including from regulatory agencies like the FDA. They frequently changed the location and names of their clinics, asked to be paid in cash (and sometimes checks) so they could not be tracked, refused to keep client records, recorded clients only by their first names, and set up their business as a private membership association to try and prevent government regulation and interference. The defendants instructed trainees and associates not to use the phrases "prescribe" or "diagnose." They attempted to avoid using "disease terms" like "cancer," which they referred to as "bad cells"—though they often did not follow their own advice. They claimed that they were only conducting "research," but followed no typical research protocols; in fact, they refused to keep any documentation of the scans they performed, which would be necessary to document and evaluate the results of any actual research.

In support of the conspiracy to commit mail and wire fraud and the conspiracy to defraud the United States and violate the FDCA, the defendants took to following actions, caused the following actions to be taken, or their co-conspirators took the following reasonably foreseeable actions, in furtherance of the conspiracy:

(1)     On or about May 17, 2021, Mary Blakley spoke on the telephone to Individual No. 1, a potential client of the Blakley Clinics, falsely claimed to have a Ph.D. in radiation nuclear physics from the Karolinska Medical Institutet, and recommended that Individual No. 1 acquire Aetheion cream from co-conspirator Janmarie Lanzo to use to treat breast cancer.

(2)     On or about May 21, 2021, co-conspirator Janmarie Lanzo conducted an interstate telephone call with Individual No. 1 and recommended that individual No. 1 acquire Aetheion cream and fenbendazole to treat breast cancer.

(3)     On or about September 7, 2022, Mary Blakley and Fred Blakley caused a bank check in the amount of $500, which had been sent using the U.S. Mails, to be deposited in a bank account they controlled in partial payment for an ultrasound machine that they claimed employed their "smart chip technology."

(4)     On or about August 31, 2022, a bank check was mailed using the U.S. Mails to Mary Blakley and Fred Blakley in partial payment for the purchase of an ultrasound machine to be used to open a new Blakley Clinic franchise.

(5)     On or about November 15, 2022, Mary Blakley sent an interstate email to Individual No. 3, a potential franchisee of the Blakley Clinics, discussing the purported smart chip on the machine that Individual No. 3 had purchased.

(6)     On or about November 21, 2022, Mary Blakley and Fred Blakley conducted an interstate telephone conversation with Individual No. 2, a client of the Blakley Clinics, and Individual No. 3, during which Mary Blakley and Fred Blakely purported to teach Individual No. 3 to operate an ultrasound machine and use "smart chip technology" to detect cancer.

(7)     On or about January 13, 2023, co-conspirator Janmarie Lanzo shipped two bottles of Aetheion cream and one bottle of fenbendazole to Individual No. 2 by U.S. Mail.

(8)     On or about April 7, 2023, co-conspirator Janmarie Lanzo had an interstate telephone call with Individual No. 2, during which Individual No. 2 gave Lanzo a credit card number to pay for fenbendazole.

(9)     On or about June 12, 2023, co-conspirator Steven Seely (charged elsewhere) shipped two bottles of fenbendazole to Individual No. 2 by U.S. Mail.

(10)   On or about August 2, 2023, Individual No. 2 had an interstate telephone call with co-conspirator Steven Seely, during which Seely discussed the purported medical benefits of fenbendazole.

2. <u>Firearms Case, 25-cr-537-1</u>

If the case alleged in the information were to proceed to trial, the government would prove the following facts, among others, through witness testimony and exhibits. This memorandum sets forth only the essential facts that would need to be proved to establish the elements of the offense charged.

The defendant, Fred Blakley, is a convicted felon. In 1998, Fred Blakley pled guilty to conspiracy to manufacture methamphetamine in the U.S. District Court for the District of Nevada. *See United States v. Mary Blakley et al.*, No. 3:97-cr-66 (D. Nev.). Fred Blakley served more than 3 years in prison.

During the investigation of fraud offenses involving Fred Blakley, an undercover FBI agent and an undercover retired FBI agent (the "undercovers") engaged in audio- and video-recorded conversations with Fred Blakley, which frequently turned to a discussion of firearms. During these conversations, Fred Blakely told the undercovers that he had multiple firearms. In August 2022, the undercovers visited Fred Blakley's home, which he shared with his wife, and co-defendant in case 25-cr-8, Mary Blakley, where Fred Blakley showed the undercovers several firearms, handled the firearms, and explained how he had modified the firearms. In December 2022, Fred Blakley told the undercovers that he would need to move the firearms because a family member who was on parole was going to come live with him. In March 2023, Fred Blakley told the undercovers that he had moved the firearms to a garage at the home of his pastor for safe keeping. In March 2023, the undercovers visited Fred Blakley at the pastor's garage where Fred Blakley showed them several firearms, including firearms they had

previously seen at Fred Blakley's residence. The undercovers visited Fred Blakley at the pastor's garage again in January 2023 and November 2023 where they observed Fred Blakley with some of the same firearms and some additional firearms.

During conversations with the undercovers, Fred Blakley frequently referred to these firearms as "his firearms." Fred Blakley also discussed having a prior conviction that prohibited him from buying or owning firearms.

Fred Blakley had free access to the pastor's garage where the firearms were stored and visited it frequently.

On January 22, 2025, the pastor's garage was searched pursuant to a federal search warrant. During that search, federal agents recovered the 29 firearms and ammunition listed in the information. At trial, an expert would testify that each of these firearms travelled in interstate commerce. At least one of these firearms had a suppressor/silencer attached, which is a firearm described in 26 U.S.C. § 5845(a). Federal agents also recovered additional firearms that were privately manufactured or manufactured in Arizona.

Fred Blakley was arrested the same day as the search. In a post-*Miranda* interview, Fred was asked about the firearms in the pastor's garage. He first stated that the firearms were not his, but he acknowledged he was a felon and could not possess firearms. Fred later acknowledged that he purchased over $66,000 worth of firearms and related materials and had them sent to the pastor's residence.

### V.    PLEA AGREEMENT

The parties have executed a plea agreement, that will be presented to the Court during a hearing regarding entry of the guilty plea. The agreement includes a supplement to be filed under seal.

## VI.  CONCLUSION

The government requests that the Court conduct a hearing under Federal Rule of Criminal Procedure 11 and if warranted then accept the defendant's plea of guilty.

Respectfully submitted,

DAVID METCALF
United States Attorney


*/s/ Ruth Mandelbaum*
RUTH MANDELBAUM
Assistant United States Attorney

ALEXANDER B. BOWERMAN
Special Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that this Change of Plea Memorandum has been served by email on:

> Megan Davies
> mjd@mjdavieslaw.com
> Counsel for Defendant Fred Blakley

> */s/ Ruth Mandelbaum*
> Ruth Mandelbaum
> Assistant United States Attorney

Date: December 26, 2025